**No. 25-1583**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

ACCORDIUS HEALTH AT ASHEVILLE LLC, et al.,
*Plaintiffs-Appellants*,
v.
UNITED STATES SMALL BUSINESS ADMINISTRATION, et al.,
*Defendants-Appellees*.

---

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
NO. 1:23-CV-00129-MR

---

**REPLY BRIEF OF APPELLANTS**

---

Jenny R. Buchheit
ICE MILLER LLP
One American Square, Ste. 2900
Indianapolis, IN 46282
317-236-2100
Jenny.Buchheit@icemiller.com

Joshua Klarfeld
ICE MILLER LLP
600 Superior Ave. East, Ste. 1600
Cleveland, OH 44114
216-394-5063
Joshua.Klarfeld@icemiller.com

Kirk G. Warner
J. Mitchell Armbruster
SMITH, ANDERSON, BLOUNT,
DORSETT, MITCHELL &
JERNIGAN, L.L.P.
Post Office Box 2611
Raleigh, NC 27602-2611
919-821-1220
kwarner@smithlaw.com
marmbruster@smithlaw.com

*Attorneys for Appellants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

ARGUMENT ......................................................................................................... 1

I.    Appellees' concession that the district court based its decision on a different theory than the one the administrative agency adopted mandates reversal .............................. 1

II.   The district court erred in determining SBA did not exceed its statutory authority in enacting the Corporate Group Rule ........................................................................................ 3

       A.    ¶(36) displaced contrary §7(a) authority ..................................... 4

       B.    SBA's discretion to administer PPP loans did not authorize new borrower-disqualification criteria ............................................... 7

              1.    Administrative authority did not allow SBA to redefine eligibility .......................................................... 7

              2.    The CARES Act's targeted waivers cut against Appellees' position ........................................................ 10

              3.    That Congress limited appropriations does not mean it authorized new eligibility restrictions................................................................... 12

       C.    Congress did not ratify the Corporate Group Rule ................... 13

       D.    The Corporate Group Rule does not merely limit loan amounts ........................................................................ 17

III.  The district court erred in determining the Corporate Group Rule was neither arbitrary nor capricious ............................... 21

IV.   Appellants were not part of a "single corporate group" under the Corporate Group Rule ........................................................ 24

       A.    Appellants were not majority owned, directly or indirectly, by a "common parent." ........................................... 24

i

B.    The Record does not establish that a partnership-in-fact owned Appellants ................................................. 27

CONCLUSION ................................................................................. 30

CERTIFICATE OF COMPLIANCE ................................................ 31

CERTIFICATE OF SERVICE ........................................................ 32

ii

# TABLE OF AUTHORITIES

CASES                                                                    PAGES

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)................................................................14

*AT&T Corp. v. Iowa Utils. Bd.,*
    525 U.S. 366 (1999)..................................................................8

*Biden v. Missouri,*
    595 U.S. 87 (2022).................................................................22

*Bostock v. Clayton Cnty., Georgia,*
    590 U.S. 644 (2020)...............................................................25

*Brown v. Gardner,*
    513 U.S. 115 (1994)...............................................................15

*Chengelis v. Cenco Instruments Corp.,*
    386 F.Supp. 862 (W.D. Pa. 1975) ...............................................28

*Coleman v. Kendall,*
    74 F.4th 610 (4th Cir. 2023) ....................................................22

*Commodity Futures Trading Comm'n v. Schor,*
    478 U.S. 833 (1986)...............................................................16

*D.C. Fed'n of Civic Ass'ns, Inc. v. Airis,*
    391 F.2d 478 (D.C. Cir. 1968)...................................................14

*Duncan v. Walker,*
    533 U.S. 167 (2001)............................................................6, 10

*DV Diamond Club of Flint v. SBA,*
    960 F.3d 743 (6th Cir. 2020) ...............................................*passim*

*EEOC v. Baltimore Cnty.,*
    904 F.3d 330 (4th Cir. 2018) .....................................................3

*E.E.O.C. v. Seafarers Intern. Union,*
    394 F.3d 197 (4th Cir. 2005) ....................................................13

iii

*Forest View Rehab. & Nursing Ctr. v. SBA*,
   No. 1:24-cv-01490, ECF #40 (N.D. Ill. Sept. 16, 2024) .................................2

*Forest View Rehabilitation and Nursing Center, LLC v. SBA*,
   2024 WL 5247837 (N.D. Ill. Dec. 30, 2024) ................................................25

*In re Gateway Radiology Consultants, P.A.*,
   983 F.3d 1239 (11th Cir. 2020) ........................................................10, 11, 15

*In re Skefos*,
   2020 WL 2893413 (Bankr. W.D. Tenn. June 2, 2020) .........................*passim*

*Jama v. Immigr. & Customs Enf't*,
   543 U.S. 335 (2005).......................................................................................14

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)..............................................................................*passim*

*March v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989).......................................................................................22

*Marvin M. Brandt Revocable Tr. v. U.S.*,
   572 U.S. 93 (2014).........................................................................................13

*Michigan v. EPA*,
   576 U.S. 743 (2015)..........................................................................................3

*Morton v. Ruiz*,
   415 U.S. 199 (1974)................................................................................12, 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983)...................................................................2, 22, 23, 24

*Oak Lawn Respiratory & Rehab. Ctr. v. SBA*,
   No. 1:23-cv-04363, ECF #44 (N.D. Ill. Apr. 1, 2024) ..................................2

*Pharaohs GC, Inc. v. SBA*,
   990 F.3d 217 (2nd Cir. 2021) .........................................................10, 11, 15

*SAS Inst. Inc. v. Iancu*,
   584 U.S. 357 (2018).........................................................................................9

iv

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013)................................................................16

*Simmons v. Himmelreich*,
    578 U.S. 621 (2016)..................................................4, 6, 11, 16

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
    580 U.S. 405 (2017)...................................................................4

*Veltor Underground, LLC v. Small Bus. Admin.*,
    143 F.4th 727 (6th Cir. 2025) ..................................................16

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)............................................................8, 15


**STATUTES AND RULES**                                              **PAGES**

5 U.S.C. §706(2)(A).................................................................21, 22, 24

5 U.S.C. §706(2)(C).....................................................................13, 21

15 U.S.C. §632(a)(5)(B) ...................................................................4, 18

15 U.S.C. §636(a)(36)...........................................................5, 6, 12, 18

15 U.S.C. §636(a)(36)(B) ...............................................................*passim*

15 U.S.C. §636(a)(36)(D) ...............................................................*passim*

15 U.S.C. §636(a)(36)(D)(i) ..........................................................4, 9, 18, 20

15 U.S.C. §636(a)(36)(D)(iv) .............................................................10, 11

15 U.S.C. §636(a)(36)(E)................................................................*passim*

15 U.S.C. §636(a)(36)(I).....................................................................10, 11

15 U.S.C. §636(a)(36)(J) ....................................................................10, 11

85 Fed. Reg. 20,811 (Apr. 15, 2020) ......................................................12

85 Fed. Reg. 26,324 (May 4, 2020)..................................................*passim*

v

Pub. L. No. 116-142, 134 Stat. 641 (June 2020) .......................................................14

Pub. L. No. 116-147, 134 Stat. 660 (July 2020) .......................................................14

Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 2020) .....................................................14

Pub L. No. 117-2, 135 Stat. 4 (Mar. 2021) ...............................................................14

Pub. L. No. 117-6, 135 Stat. 250 (Mar. 2021) ..........................................................14

## ARGUMENT[1]

Based on the CARES Act's plain text and the Record in this case, Appellants qualified both for the PPP loans they received and for forgiveness of those loans. Appellees' arguments to the contrary fail. Therefore, the Judgment should be reversed.

**I.    Appellees' concession that the district court based its decision on a different theory than the one the administrative agency adopted mandates reversal.**

This Court can, and should, reverse the district court's decision based on Appellees' own concession. Appellees admit the administrative decisions under review did not analyze Appellants' eligibility under a partnership-in-fact theory, the basis on which the district court affirmed OHA's determinations. (Appellees' Br. ("Br.") (ECF #28) pp.60–62.) Rather, OHA concluded Appellants should be treated as a "single corporate group" by applying SBA affiliation principles. (JA811–815, JA1148–1151.) Instead of defending OHA's decisions on their stated bases, Appellees advanced a different theory in the district court, one centered on an alleged partnership-in-fact. (JA1504–1554.) The district court ultimately adopted Appellees' theory. (JA1575–1579.) Appellees now acknowledge what the Record

---

[1] Unless otherwise indicated, defined terms herein have the same meaning as in Appellants' Opening Brief (ECF #15) ("Opening Br.").

1

demonstrates: the rationale on which the district affirmed was not the rationale OHA employed.

Appellees attempt to avoid ***the error they introduced in this lawsuit***[2] by suggesting forfeiture. But Appellants were not required to anticipate the district court would adopt a theory different from the one that formed the basis for OHA's decisions. OHA's decisions rested on an affiliation analysis, which Appellants challenged in their summary judgment motion. (JA1463–1501.) When Appellees advanced a different theory to the district court, Appellants responded and emphasized Appellees' diverging positions. (Dkt. 36, at 21 n.15.)

The *Chenery* issue Appellees' erroneously claim Appellants waived, however, did not arise until the district court adopted Appellees' litigation theory. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Only then did the question become whether the Judgment could be sustained on grounds not relied on by OHA.

The answer is no.

---

[2] Appellees appear to have introduced the partnership-in-fact issue to this litigation by recycling summary judgment arguments they advanced in a separate matter—despite the absence of any comparable OHA analysis here. *See Oak Lawn Respiratory & Rehab. Ctr. v. SBA*, No. 1:23-cv-04363, ECF #44 (N.D. Ill. Apr. 1, 2024); *Forest View Rehab. & Nursing Ctr. v. SBA*, No. 1:24-cv-01490, ECF #40 (N.D. Ill. Sept. 16, 2024).

Judicial review is ordinarily confined to the grounds invoked by the agency itself. *Michigan v. EPA*, 576 U.S. 743, 758 (2015). Appellees now expressly concede OHA's decisions did not analyze Appellants' eligibility under the partnership-in-fact theory they advocated for and the district court embraced. (Br. pp.60–62 ("[T]he government is not prepared to defend the application of the affiliation rules.").) Having obtained affirmance on a rationale OHA did not employ, Appellees cannot transform ***their error*** into a forfeiture argument against Appellants. The question here is whether the Judgment may be sustained on a rationale materially different from the one OHA applied. Appellees' concession confirms the appropriate disposition—reversal and remand to SBA.

## II.     The district court erred in determining SBA did not exceed its statutory authority in enacting the Corporate Group Rule.

The district court erred in concluding SBA possessed authority to adopt the Corporate Group Rule, which places a $20 million limit on the amount of PPP loans that businesses in a "single corporate group" can receive. (JA1568–1571); 85 Fed. Reg. 26,324, 26,325 (May 4, 2020). That conclusion rests on the erroneous premise—which Appellees continue to advance—that the Corporate Group Rule is consistent with the CARES Act's plain text. (JA1568–1571; *see* Br. pp.25–26.) It is not.

Statutory interpretation begins with the statute itself. *EEOC v. Baltimore Cnty.*, 904 F.3d 330, 333 (4th Cir. 2018). "[C]ourts must give effect to the clear

3

meaning of statutes as written," *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (quotations omitted), and "presume Congress says what it means and means what it says," *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016). The CARES Act provides qualifying businesses "shall be eligible" for PPP loans. 15 U.S.C. §636(a)(36)(D)(i); *id.* §632(a)(5)(B). Congress also imposed borrower-specific loan limits, including a maximum loan amount of $10 million per eligible borrower. *Id.* §636(a)(36)(E). The statutory text is straightforward—qualifying businesses were eligible to receive PPP loans up to the limits Congress established. *Id.* §636(a)(36)(D)–(E).

The district court's contrary conclusion rests on various arguments Appellees advanced, none of which reconciles the Corporate Group Rule with the statutory text. As explained below, Appellees' arguments fail because Paragraph (36) ("¶(36)") displaced contrary Section 7(a) ("§7(a)") authority, SBA's discretion to administer PPP loans did not authorize it to create new borrower-disqualification criteria, subsequent PPP legislation did not ratify the Corporate Group Rule, and the Corporate Group Rule is not a mere limit on loan amounts. Simply stated, SBA cannot issue a rule which renders a statute illusory—as SBA did here.

## A.    ¶(36) displaced contrary §7(a) authority.

Appellees first assert because Congress embedded the PPP within §7(a)'s existing framework, SBA retained broad authority to impose additional restrictions

4

through rulemaking, including adopting the Corporate Group Rule. (Br. pp.27–29.) Congress did not simply incorporate the PPP wholesale into ordinary §7(a) lending; it enacted PPP-specific provisions governing eligibility, loan amounts, covered uses, forgiveness, affiliation rules, and waivers of preexisting SBA requirements, ***and then*** incorporated them. *See* 15 U.S.C. §§636(a)(36), 636m. Congress likewise directed §7(a) procedures would apply only where "otherwise provided" in §636(a)(36)(B). The CARES Act thus supplied its own governing framework and displaced contrary §7(a) authority where Congress chose to provide different rules. *Id.*; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) ("[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it."). The relevant question is not whether SBA ***ordinarily*** possesses discretion under §7(a); it is whether Congress authorized the restriction SBA imposed here. It did not.

Appellees invoke SBA's authority to "make such rules and regulations as [it] deems necessary." (Br. p.28 (quotations omitted).) But broad administrative authority does not permit an agency to override statutory limits Congress enacted. *Raimondo*, 603 U.S. at 413. SBA retained discretion to administer PPP loans and allocate funds, but only within the framework Congress legislated. 15 U.S.C. §636(a)(36)(B) ("Except as otherwise provided in this paragraph, ***the Administrator may guarantee covered loans under the same terms, conditions, and processes as***

5

*a loan made under this subsection*." (emphasis added)). It did not retain authority to impose new eligibility restrictions untethered to the statute's text. *Id.* (("**Except as otherwise provided in this paragraph**…." (emphasis added)); *DV Diamond Club of Flint v. SBA*, 960 F.3d 743, 747 (6th Cir. 2020) (noting SBA could not continue applying its "longstanding ineligibility rules…pursuant to §636(a)(36)(B)" and "[t]his provision likely constitutes a catch-all governing procedures otherwise unaffected by the mandate of the CARES Act and the PPP and does not detract from the broad grant of eligibility").

Agencies may administer statutory schemes—not rewrite them. *Raimondo*, 603 U.S. at 413; *Duncan v. Walker*, 533 U.S. 167, 173 (2001) ("Congress acts intentionally and purposefully in the disparate inclusion or exclusion" of statutory text. (quotations omitted)). The CARES Act itself reinforces this bedrock of statutory construction. Congress specified who qualified for relief, prescribed borrower-specific loan limits, incorporated certain affiliation principles, and expressly waived various otherwise-applicable SBA requirements. 15 U.S.C. §636(a)(36). The absence of any "corporate group" restriction is therefore significant. Had Congress intended to authorize SBA to impose additional relationship-based disqualifications, it knew how to do so. *Simmons*, 578 U.S. at 627; *cf.* 15 U.S.C. §636(a)(36)(E). SBA cannot read into the CARES Act limits Congress chose not to enact. *Duncan*, 533 U.S. at 173.

6

Appellees' interpretation also deprives the CARES Act's limiting language of meaningful effect. Congress provided PPP loans would proceed under §7(a) procedures only "[e]xcept as otherwise provided in this paragraph." 15 U.S.C. §636(a)(36)(B). Under Appellees' reading, however, SBA retained the same discretion it possessed before Congress enacted ¶(36). (Br. pp.27–29.) That interpretation collapses the distinction Congress drew between ordinary §7(a) lending and the PPP-specific framework enacted in response to the COVID-19 emergency. *See* 15 U.S.C. §636(a)(36)(B).

The Corporate Group Rule altered that statutory framework, denying eligible borrowers available PPP loans simply because other entities had already received PPP funds. But nothing in ¶(36) authorized SBA to impose that additional restriction. *See In re Skefos*, 2020 WL 2893413, at *9 (Bankr. W.D. Tenn. June 2, 2020) (rejecting SBA's argument "that by placing the PPP with the pre-existing §7(a) lending program, Congress intended that the Administrator exercise broad discretion over the PPP").

**B.    SBA's discretion to administer PPP loans did not authorize new borrower-disqualification criteria.**

**1.    Administrative authority did not allow SBA to redefine eligibility.**

Appellees next argue various CARES Act provisions vested SBA with broad discretion to administer the PPP and allocate limited funds. (Br. pp.30–33.) None of

7

the provisions Appellees invoke authorized SBA to impose the Corporate Group Rule. Those provisions concern administration of the PPP program, not the creation of a new borrower-disqualification criterion unrelated to the statutory framework Congress established. *See* 15 U.S.C. §636(a)(36)(D)–(E).

Appellees contend the CARES Act's loan-amount provisions merely established a maximum loan amount—not a guaranteed entitlement. (Br. pp.30–31.) That argument misses the point. Appellants do not dispute SBA had the authority, in administering the program, to calculate loan amounts or approve loans below the statutory maximum, where required by the statute itself. *See* 15 U.S.C. §636(a)(36)(E). But that's not the question.

The question is whether Congress authorized SBA to impose a separate borrowing restriction that disqualified ***eligible borrowers*** based on loans received by allegedly affiliated entities. Respectfully, Congress gave no such authorization. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 459, 481 (2001) ("EPA [cannot] construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit its discretion"; EPA's "interpretation goes beyond the limits of what is ambiguous and contradicts what is…quite clear"); *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 391–92 (1999) (finding Telecommunications Act of 1996 did not authorize FCC to create exemptions to its duty to act, determining Commission's interpretation was unreasonable, vacating FCC Rule). Nothing in ¶(36)(E)

8

authorized SBA to replace statutory borrower-specific loan limits with a new corporate-group cap of its own creation, which bars qualified borrowers from eligibility. *See* 15 U.S.C. §636(a)(36)(E).

Appellees likewise focus on ¶(36)(B)'s "may guarantee" covered loans language. (Br. p.31.) But authority to guarantee loans is not authority to redefine eligibility. *Raimondo*, 603 U.S. at 413. In contrast to the permissive language Congress used to describe SBA's role in administering and guaranteeing loans, 15 U.S.C. §636(a)(36)(B), Congress used mandatory language when describing borrower eligibility, providing qualifying businesses "shall be eligible" for PPP loans. *Id.* §636(a)(36)(D)(i); *id.* §636(a)(36)(B) ("[e]xcept"); *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 362–63 (2018) ("[T]he word any carries an expansive meaning." "The word shall generally imposes a nondiscretionary duty." (quotations omitted)); *Skefos*, 2020 WL 2893413, at *8 (finding SBA exceeded its authority by excluding entities owned by bankruptcy debtors from PPP participation); *DV*, 960 F.3d at 746 (finding Act's specification that *any* business concern is eligible, as long as it meets size criteria, is a reasonable interpretation).

The statute distinguishes between SBA's administrative responsibilities and Congressionally enacted eligibility criteria. Appellees' interpretation conflates that distinction by transforming authority to administer the program into authority to

determine who qualifies for it. Nothing in ¶36(B) suggests Congress intended such an extensive delegation of authority.

### 2. The CARES Act's targeted waivers cut against Appellees' position.

The CARES Act's targeted waivers do not support the discretion Appellees claim. (Br. pp.31–32.) To the contrary, they demonstrate Congress determined which existing §7(a) requirements would apply to PPP loans and which would not. *Duncan*, 533 U.S. at 173. Congress waived affiliation requirements for certain borrowers, eliminated collateral and personal-guaranty requirements, and modified other aspects of the §7(a) framework. 15 U.S.C. §636(a)(36)(D)(iv), (I), (J). Nothing more.

To be sure, both *Gateway* and *Pharaohs* rejected interpretations that would have rendered those changes superfluous. *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1258–59 (11th Cir. 2020) (holding Congress's PPP-specific waivers demonstrated some preexisting §7(a) requirements otherwise remained applicable); *Pharaohs GC, Inc. v. SBA*, 990 F.3d 217, 227 (2nd Cir. 2021) (same).[3] Appellants' reading creates no such issue. The CARES Act's waivers continue to perform the work Congress assigned them—expanding eligibility by *eliminating*

---

[3] Appellees' argument that Appellants' position is "illogical" or "not tenable" is misplaced (Br. p.40 (quotations omitted).) *Gateway* and *Pharaohs* addressed materially different arguments. Appellants do not contend ¶(36)'s express provisions are the only requirements that can apply to PPP loans.

§7(a) requirements that otherwise would have applied to PPP loans. *See* 15 U.S.C. §636(a)(36)(D)(iv), (I), (J); *cf.* (Br. pp.42–43 (arguing Congress would not have needed to expand eligibility in these respects if PPP loans were available to all qualifying business concerns)). They do not suggest SBA was free to impose additional restrictions that were never part of §7(a)'s framework and that Congress never adopted. *DV*, 960 F.3d at 747.

The significance of those provisions is therefore not merely what Congress changed, but that Congress made changes in the first place. *Simmons*, 578 U.S. at 627. Neither *Gateway* nor *Pharaohs* held the existence of targeted statutory waivers empowered SBA to impose entirely ***new*** borrower-disqualification criteria contrary to the statutory text. *Gateway*, 983 F.3d at 1258–59; *Pharaohs*, 990 F.3d at 227.

If anything, the waivers reinforce Appellants' position: Congress demonstrated it knew how to modify §7(a)'s framework when it wanted to. *Simmons*, 578 U.S. at 627. The Corporate Group Rule was not one of those modifications. Appellees' theory would convert Congress's targeted alterations into evidence of a sweeping authority to impose additional restrictions Congress never enacted—even though Congress ***did*** enact PPP-specific rules governing borrower eligibility and loan amounts. 15 U.S.C. §636(a)(36)(B), (E); *cf. Raimondo*, 603 U.S. at 413.

### 3.     That Congress limited appropriations does not mean it authorized new eligibility restrictions.

Appellees further assert SBA necessarily possessed broad discretion because the PPP involved finite appropriations, and Congress provided no detailed mechanism for triaging limited funds among competing applicants. (Br. pp.32–33.) Congress undoubtedly understood PPP funding was finite. But limited funding does not automatically expand an agency's authority. *Raimondo*, 603 U.S. at 413. Congress addressed funding constraints through appropriations, borrower-specific loan formulas, loan caps, and other statutory mechanisms. 15 U.S.C. §636(a)(36). It did not, however, authorize SBA to create new categories of ineligible borrowers in the name of preserving funds. *See id.*

Administrative discretion concerns ***how*** funds are distributed within the framework Congress enacted. *See Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."); *cf.* 85 Fed. Reg. 20,811, 20,813 (Apr. 15, 2020) ("first-come, first-served" (quotations omitted)). It does not authorize SBA to decide which eligible borrowers to exclude from the program (i.e., ***who***). *DV*, 960 F.3d at 747 ("broad grant of eligibility"); *Skefos*, 2020 WL 2893413, at *10, 13 ("The Administrator exceeded the authority granted to her in the CARES Act by excluding businesses from the PPP on the basis that their

12

owners are 'presently involved in bankruptcy'….SBA acted arbitrarily and capriciously in excluding applicants whose owners are debtors in bankruptcy from the PPP."). The Corporate Group Rule did not regulate the timing of applications, the order in which loans were processed, or the mechanics of distributing appropriated funds. *See* 85 Fed. Reg. at 26,325. It impermissibly imposed a substantive restriction that denied PPP loans to borrowers who satisfied Congress's eligibility requirements. *Id.*

Each of Appellees' arguments suffers from the same flaw. Whether framed in terms of maximum loan amounts, permissive statutory language, targeted waivers, or finite appropriations, Appellees identify provisions granting SBA discretion to administer PPP loans. ***But they do not identify any provision authorizing SBA to impose the Corporate Group Rule***, because none exists. 5 U.S.C. §706(2)(C).

### C.     Congress did not ratify the Corporate Group Rule.

Appellees' contention that Congress ratified the Corporate Group Rule through subsequent legislation and appropriations also fails. (Br. pp.33–37.) Ratification is not lightly inferred. *Marvin M. Brandt Revocable Tr. v. U.S.*, 572 U.S. 93, 109 (2014) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." (quotations omitted)); *E.E.O.C. v. Seafarers Intern. Union*, 394 F.3d 197, 202 (4th Cir. 2005) ("[I]nferences from congressional silence, in the context of administrative law, are often treacherous." (cleaned up)).

13

Courts generally look for evidence that Congress specifically considered the position at issue, often in circumstances involving a settled interpretation. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 349 (2005) ("broad and unquestioned"); *Alexander v. Sandoval*, 532 U.S. 275, 291–93 (2001) ("[R]eliance on congressional inaction…deserves little weight in the interpretive process[,]" and "when…Congress has not comprehensively revised a [statute] but has made only isolated amendments," it is "impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation." (cleaned up)); *D.C. Fed'n of Civic Ass'ns, Inc. v. Airis*, 391 F.2d 478, 481 (D.C. Cir. 1968) (addressing ratification by appropriation). These hallmarks are missing here. Appellees identify no evidence that Congress specifically considered the Corporate Group Rule, (Br. pp.33–37), the Corporate Group Rule was only months old when Congress revisited the PPP, and Congress never enacted or referenced the restriction in any subsequent legislation.[4]

Moreover, Appellees' ratification theory rests on a mistaken premise. Specifically, they characterize the Corporate Group Rule as SBA's "interpretation"

---

[4] *Compare* 85 Fed. Reg. at 26,325 (May 2020), *with* Pub. L. No. 116-142, 134 Stat. 641 (June 2020) (not addressing Rule); Pub. L. No. 116-147, 134 Stat. 660 (July 2020) (same); Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 2020) (same); Pub L. No. 117-2, 135 Stat. 4 (Mar. 2021) (same); Pub. L. No. 117-6, 135 Stat. 250 (Mar. 2021) (same).

14

of the CARES Act.[5] (Br. pp.36–37.) But the Corporate Group Rule did not merely *interpret* an ambiguous statutory term or resolve a textual gap. *See Whitman*, 531 U.S. at 481; *Morton*, 415 U.S. at 231. ¶(36) already established borrower-specific eligibility requirements and borrower-specific loan limits. 15 U.S.C. §636(a)(36)(D)–(E). The Corporate Group Rule imposed a separate aggregate borrowing restriction that appears nowhere in the statutory text. 85 Fed. Reg. at 26,325. Thus, this case does not concern congressional reenactment of a statutory provision carrying a settled interpretation.[6] *See Brown v. Gardner*, 513 U.S. 115, 121 (1994) ("[C]ongressional silence lacks persuasive significance, particularly where administrative regulations are inconsistent with the controlling statute." (cleaned up)). It concerns whether Congress ever adopted a substantive restriction SBA created.

It did not. *See supra* note 4. Congress repeatedly amended, extended, and refinanced the PPP. *Id.* These enactments demonstrate Congress remained actively

---

[5] To the extent Appellees' ratification theory depends on deference to SBA's interpretation of the CARES Act, that premise is inconsistent with *Raimondo*. 603 U.S. at 412 ("Courts must exercise their independent judgment….").

[6] Contrary to Appellees' arguments, the Corporate Group Rule did not accompany enactment of the CARES Act, but was adopted through a later interim final rule. 85 Fed. Reg. at 26,325. This case also does not involve an "interpretation," including a settled one. (Br. p.37); *compare DV*, 960 F.3d at 743, *with Gateway*, 983 F.3d at 1239, and *Pharaohs*, 990 F.3d at 217. The PPP was a ***temporary*** emergency program that ***ended*** in May 2021. That applicable SBA rules have remained "consistent" is meaningless. (Br. p.37.)

15

engaged in shaping the program and knew how to modify PPP requirements when it wished to do so. *Simmons*, 578 U.S. at 627. Yet, Congress never codified the Corporate Group Rule, incorporated its $20 million aggregate cap into the statute, or otherwise amended ¶(36) to authorize it. *See supra* note 4. If anything, the repeated amendments underscore the absence of congressional decision to adopt the Corporate Group Rule. *Simmons*, 578 U.S. at 627.

The cases Appellees cite do not compel a different result. (Br. p.36.) Those cases involved circumstances where Congress reenacted statutory language against the backdrop of positive legislation or a settled interpretation. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (positive legislation); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 159 (2013) (settled interpretation); *Veltor Underground, LLC v. Small Bus. Admin.*, 143 F.4th 727, 740 (6th Cir. 2025) (White, J., concurring) (noting Congress revised the precise definition at issue). This case involves neither. The Corporate Group Rule was adopted through an interim final rule during the PPP's brief existence and was never affirmatively approved by Congress. *See supra* note 4.

Ultimately, because Congress never enacted, codified, or otherwise adopted the Corporate Group Rule, it was never "ratified."

### D.    The Corporate Group Rule does not merely limit loan amounts.

Appellees next attempt to defend the district court's ruling by arguing the CARES Act did not require SBA to guarantee the maximum loan amount to every eligible borrower. (Br. pp.37–45.) In doing so, they largely recycle their arguments concerning SBA's discretion, PPP's relationship to the §7(a) program, statutory superfluity, and congressional ratification. (*Compare id.* pp.37–38, 40, 42–45, *with id.* pp.27–37.) Those arguments fail for reasons already discussed. The remaining question is whether the Corporate Group Rule merely governed loan amounts, as Appellees contend, or instead, effectively imposed a substantive eligibility restriction Congress never enacted or intended.

As noted above, this case does not concern SBA's authority to calculate loan amounts under the formula Congress enacted. *See* 15 U.S.C. §636(a)(36)(E). This case concerns whether SBA could adopt a rule that permitted it to deny PPP loans altogether under an aggregate corporate-group cap that Congress never adopted, when the applicants qualified both for those loans and for forgiveness of the loans. Recasting the Corporate Group Rule as a limit on loan amounts misses the mark. (Br. pp.37–45.)

The CARES Act established a borrower-specific framework governing both eligibility and loan amounts. 15 U.S.C. §636(a)(36)(D)–(E). Congress provided qualifying businesses "shall be eligible" to receive covered loans and prescribed a

17

borrower-specific formula for calculating the maximum amount available to each applicant. *Id.* §636(a)(36)(D)(i); *id.* §632(a)(5)(B). Congress therefore selected the ***borrower—not a corporate-group***—as the relevant unit of analysis. *Compare id.* §636(a)(36)(D)(i), *with* 85 Fed. Reg. at 26,325. Appellees' argument depends on replacing that framework with one of SBA's own creation. Rather than evaluating individual borrowers under the criteria Congress enacted, the Corporate Group Rule aggregated distinct borrowers and imposed a cap based on loans received by certain affiliated entities. *Compare* 15 U.S.C. §636(a)(36)(D)(i), *with* 85 Fed. Reg. at 26,325. Nothing in ¶(36) authorizes that approach. 15 U.S.C. §636(a)(36); *DV*, 960 F.3d at 747.

Appellees' hypothetical involving a corporate group that already received $19,999,999 in PPP loans proves nothing. (Br. p.39.) It merely assumes the validity of the Corporate Group Rule and then describes how that Rule would operate. (*Id.*) The applicable question is not how SBA would allocate funds once the Corporate Group Rule is applied; it is whether SBA possessed authority to impose an aggregate cap in the first place. That a borrower subject to the Corporate Group Rule might still receive a reduced loan amount because of that Rule does not establish that Congress authorized SBA to aggregate otherwise eligible borrowers and limit their access to PPP funds based on loans received by affiliates. *Compare* 15 U.S.C. §636(a)(36)(D)–(E), *with* 85 Fed. Reg. at 26,325.

Nor is Appellees' distinction between loan amounts and eligibility meaningful. (Br. p.39.) Appellees insist the Corporate Group Rule governed loan amounts rather than eligibility because a borrower that exceeded the aggregate cap simply could not receive additional loan proceeds. (*Id.*) That distinction collapses under the Corporate Group Rule's own weight. Under Appellees' view, once a corporate group reached the $20 million cap, an otherwise qualified borrower remained "eligible," but could receive only a $0 loan. (*Id.*) That is "eligibility" in name only. Whether characterized as an eligibility restriction or a loan-amount limit, the Corporate Group Rule impermissibly prevented qualified borrowers from obtaining available PPP funds based solely on loans received by other entities. *DV*, 960 F.3d at 747 ("[T]hat other businesses will not receive loans if plaintiffs do is inherent in the SBA's practice of guaranteeing loans on a first-come, first-served basis. Regardless of whether plaintiffs do or do not receive these loans, there will be other businesses that do or do not receive loans as well. The SBA otherwise continues doing the same work it has been doing.").

Appellees' effort to characterize the Corporate Group Rule as concerning only *loan amounts* and not *eligibility* overlooks how SBA and OHA themselves described the issue below. OHA repeatedly referred to Appellants as "ineligible for the loans at issue" and affirmed SBA's decisions finding Appellants "ineligible for

19

the PPP loans." (*See* JA798–816, JA1136 –1152.) Those decisions demonstrate that the Corporate Group Rule affected not only loan amounts but also eligibility.

Appellees further invoke the principle that statutory provisions must be read in context and as part of the statute as a whole. (Br. pp.40–42.) Appellants agree. The CARES Act did not simply make additional entities eligible for PPP loans. 15 U.S.C. §636(a)(36)(D)(i). It also provided that PPP loans would be guaranteed "[e]xcept as otherwise provided in this paragraph." *Id.* §636(a)(36)(B); *DV*, 960 F.3d at 747. Congress thus specified which §7(a) requirements would apply, which would not, and which would be modified for PPP loans. *See id.* As explained above, that carefully tailored framework undermines—not supports—Appellees' assertion that SBA retained authority to impose additional restrictions untethered to the provisions Congress enacted. *See supra* Section II(A–B).

Congress's later treatment of religious organizations also does not support the Corporate Group Rule. (Br. pp.44–45.) The statutory amendment on which Appellees rely concerned a *preexisting* SBA restriction that was "carried forward" into the PPP. (*Id.* p.44.) The Corporate Group Rule is different. It is not a preexisting eligibility restriction incorporated into ¶(36), but a *new* limit SBA created after Congress enacted the CARES Act. Congress's decision to modify a carried-forward restriction says nothing about SBA's authority to create an altogether new one. *See DV*, 960 F.3d at 747 ("It was necessary to specify non-profits because they are not

20

businesses, whereas the Act's specification that eligibility is conferred on 'any business concern' encompasses sexually oriented businesses such as strip clubs that would ordinarily be ineligible for loans." (cleaned up)).

Appellees' argument still rests on the premise that because the CARES Act established maximum loan amounts rather than guaranteed awards, SBA remained free to create a corporate-group cap from whole cloth. That conclusion does not follow. SBA's replacement of Congress's borrower-specific eligibility and loan-calculation framework with its own restriction finds no support in the statute. *Raimondo*, 603 U.S. at 413. Because the Corporate Group Rule imposed a restriction Congress never enacted, it exceeded SBA's authority and should be set aside. *Id.*; 5 U.S.C. §706(2)(C). The district court's Judgment to the contrary should be reversed.

## III.    The district court erred in determining the Corporate Group Rule was neither arbitrary nor capricious.

Appellees erroneously contend Appellants' arbitrary-and-capricious challenge repackages statutory arguments and misunderstands the governing standard. (Br. p.46.) It does neither. The APA separately requires agencies to act within statutory limits ***and*** engage in reasoned decision-making. 5 U.S.C. §706(2)(A), (C). Courts addressing PPP restrictions likewise analyze those inquiries independently. *See Skefos*, 2020 WL 2893413, at *10, 13. Appellants' challenge therefore rests not only on SBA's lack of authority to adopt the Corporate Group

21

Rule, but also on SBA's failure to adequately explain the Corporate Group Rule it adopted.

Under the APA, courts must set aside arbitrary and capricious agency actions. 5 U.S.C. §706(2)(A). An agency must articulate "a rational connection between the facts found and the choice made." *Motor*, 463 U.S. at 43 (quotations omitted). And a reviewing court cannot "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*; *March v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *Biden v. Missouri*, 595 U.S. 87, 96 (2022); *Coleman v. Kendall*, 74 F.4th 610, 619 (4th Cir. 2023).

As set forth on pages 17–22 of Appellants' Opening Brief, the district court overstepped in its analysis by filling in the blanks for SBA—supplying support for SBA's actions that SBA itself did not give. Appellees' defense of the Corporate Group Rule confirms that defect. They repeatedly invoke SBA's stated desire to preserve limited PPP resources and make loans available to a greater number of borrowers. (Br. pp.46–48); *but see DV*, 960 F.3d at 747. But identifying a policy objective is not the same as explaining the specific rule adopted to achieve it. *Motor*, 463 U.S. at 43 (detailing when an agency rule is arbitrary and capricious).

An agency must articulate "a rational connection between the facts found and the choice made." *Id.* (quotations omitted). SBA never explained why affiliated entities should be aggregated, why a "corporate group" was the appropriate unit of

22

analysis, why majority ownership triggered aggregation, or why $20 million was the proper threshold. 85 Fed. Reg. at 26,325 n.1. Nor did SBA explain how those choices complied with the CARES Act's borrower-specific eligibility and loan-calculation framework. *Compare id.*, *with* 15 U.S.C. §636(a)(36)(D)–(E). Instead, the Corporate Group Rule's entire rationale appeared in a brief footnote asserting that an aggregate cap was "necessary and appropriate" to preserve PPP resources and expand access to funding. 85 Fed. Reg. at 26,325 n.1. That conclusory explanation falls far short of the reasoned decision-making the law requires. *Motor*, 463 U.S. at 43.

Recognizing SBA's complete lack of support, the ***district court*** supplied rationales for the Corporate Group Rule in its Judgment. (JA1572–1573.) To that end, the court emphasized how the Corporate Group Rule allegedly promoted broader access to PPP funds and balanced competing policy considerations. (*Id.*) But those are post hoc justifications. *Motor*, 463 U.S. at 50. SBA itself never articulated those reasons when it adopted the Corporate Group Rule. *Id.* at 43, 50 (While courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," there must still be a "rational connection between the facts found and the choice made." (quotations omitted)); *see Skefos*, 2020 WL 2893413, at *11–13. Courts cannot rescue deficient agency reasoning by filling gaps the agency left unexplained. *Motor*, 463 U.S. at 43.

23

The extraordinary circumstances surrounding the pandemic do not permit a different result. (Br. pp.48–49.) Agencies may act quickly during emergencies, but they must still act within statutory limits and supply a reasoned explanation for the rules they adopt. *See* Opening Br. pp.19, 21; *Motor*, 463 U.S. at 43; *Skefos*, 2020 WL 2893413, at *11–13. SBA offered only conclusory justifications for a borrower-disqualification criterion Congress never enacted, while failing to explain the Corporate Group Rule's central features. *See* 85 Fed. Reg. at 26,325 n.1. The district court erred in concluding the Corporate Group Rule survived arbitrary-and-capricious review. 5 U.S.C. §706(2)(A).

## IV. Appellants were not part of a "single corporate group" under the Corporate Group Rule.

Even setting aside Appellees' concession that the agency did not rely on the partnership-in-fact rationale adopted by the district court, (Br. pp.54, 60–62); *see* Section I, *supra*, Appellants were not part of a "single corporate group" under the Corporate Group Rule's terms.

### A. Appellants were not majority owned, directly or indirectly, by a "common parent."

The Corporate Group Rule applies only to businesses that are "majority owned, directly or indirectly, by a common parent." 85 Fed. Reg. at 26,325. That requirement contains two distinct elements: the existence of a "common parent" and majority ownership by that parent.

Appellees devote substantial attention to whether a partnership may qualify as a "parent" under the Corporate Group Rule. (Br. pp.50–53.) But Appellants do not argue on appeal that a partnership can never serve as a "parent." Rather, ordinary dictionary definitions, common legal usage, and the FAR definition[7] all demonstrate the Corporate Group Rule contemplates an ownership relationship in which a parent owns the relevant businesses—a relationship that does not exist here. Indeed, Appellees invoke many of the same definitions. (Br. p.51.) The Record does not establish a common parent owned Appellants.

Appellees' reliance on *Forest View Rehabilitation and Nursing Center, LLC v. SBA*, 2024 WL 5247837 (N.D. Ill. Dec. 30, 2024), is misplaced. (*See* Br. pp.51–52.) That nonbinding district court decision, which itself is currently on appeal, involved a materially different ownership structure. There, SBA concluded an individual and business entity formed a partnership, and the partnership itself owned the applicant LLC. *Forest*, 2024 WL 5247837, at *3, 12. Here, by contrast, SBA admitted that each Appellant was owned directly by two ***individuals***—Hyman and Zanziper. (JA1522; *see* JA1565.) Thus, *Forest* does not resolve the question presented.

---

[7] Appellants maintain the FAR definition is persuasive. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020) (explaining courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment").

*That distinction is dispositive*. SBA's theory ultimately rests on the premise that because Hyman and Zanziper allegedly operated a partnership-in-fact, their individual interests may be treated as common-parent ownership. (Br. pp.51, 54–60.) But the Corporate Group Rule requires ownership by the common parent. 85 Fed. Reg. at 26,325. Appellees' theory assumes the alleged partnership stood in the ownership position of a common parent, but they identify no evidence establishing that proposition. *See* Section IV(B), *infra*. The Record instead reflects the opposite: Appellants were owned directly by Hyman and Zanziper, two individuals, and no one owns Hyman and Zanziper. (JA1522, JA1565.)

Appellees likewise do not address the Corporate Group Rule's separate majority-ownership requirement. (Br. pp.50–60.) The Corporate Group Rule applies only where businesses are "majority owned, directly or indirectly, by a common parent." 85 Fed. Reg. at 26,325. Even under Appellees' theory, no identified parent owned a majority interest in Appellants. (Br. pp.50–60.) Appellees' argument focuses exclusively on whether a partnership may qualify as a parent, which is, at best, only half the inquiry. The Corporate Group Rule separately requires majority ownership by that parent. 85 Fed. Reg. at 26,325. Here, Hyman and Zanziper each owned 50% of each Appellant entity—i.e., equal shares/not a majority. (JA81, ¶3.)

The district court nevertheless concluded Appellants were owned by a common parent because Hyman and Zanziper allegedly operated a partnership-in-

26

fact. (JA1575–1579.) Neither the Corporate Group Rule nor the Record supports equating two individuals, each owning 50% of each entity, as owners of a single parent entity. The Corporate Group Rule speaks in the singular—a common parent—and requires majority ownership by that parent. 85 Fed. Reg. at 26,325. Because Appellees identify no such owner here, the district court's conclusion cannot stand.

### B. The Record does not establish that a partnership-in-fact owned Appellants.

Recognizing that no identified parent entity directly owns Appellants, Appellees ultimately rely on the theory that Hyman and Zanziper operated a partnership-in-fact that functioned as a "common parent." (Br. pp.54–60.) The Record does not support that argument, either. The evidence Appellees cite shows only that Hyman and Zanziper participated together in numerous business ventures. (*Id.*) That may demonstrate repeated co-investment, but it does not establish the existence of a separate partnership entity that owned Appellants. (JA1522–1523; *see* Opening Br. p.33.)

Joint participation in multiple ventures does not itself establish a partnership-in-fact that owns those ventures. (*See* JA1522–1523.) As Appellants explained in their Opening Brief, each Appellant was organized as a distinct LLC and owned directly by Hyman and Zanziper. (Opening Br. pp.29–32; JA1543 ("In the parlance of the state laws under which LLCs are established, persons such as Mr. Hyman and Mr. Zanziper who own interests in an LLC are referred to as members." (quotations

27

omitted))); *Chengelis v. Cenco Instruments Corp*., 386 F.Supp. 862, 865 (W.D. Pa. 1975) ("[T]he corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." (quotations omitted)). Appellees identify no organizational document, ownership record, operating agreement, or other evidence showing that a separate partnership entity owned Appellants. (Br. pp.54–60.)

The absence of traditional indicia of a partnership is equally telling. Appellees identify no evidence that the alleged partnership held title to property, maintained bank accounts, filed tax returns, received PPP proceeds, maintained books and records, or otherwise operated a distinct business enterprise. (*Id*.) Appellees do not identify evidence that the alleged partnership shared profits and losses from Appellants, as opposed to Hyman and Zanziper receiving distributions in their capacities as individual LLC members. Appellees point to none of the hallmarks ordinarily associated with a separate partnership entity because the Record contains none.

Instead, Appellees ask the Court to *infer* a partnership from the fact Hyman and Zanziper invested together in numerous businesses. (Br. pp.54–60.) That inference disregards the ownership structures reflected throughout the Record. Appellants operated as LLCs. (JA1543.) Their ownership interests were held by Hyman and Zanziper individually. (JA1522, JA1565.) Appellees identify no

28

evidence that those interests were transferred to, held by, or owned for the benefit of a partnership. Therefore, Appellees' theory depends on impermissibly treating ownership held by two individuals as though it were ownership held by a separate entity without identifying evidence that such an entity ever existed.

The district court similarly relied on the conclusion that Hyman and Zanziper intended to associate with one another as co-owners of a broader enterprise. (JA1577–1578.) But the cited evidence establishes only that they repeatedly invested together. (*Id.*) It does not establish that they formed a separate partnership that owned Appellants. (*See* JA1522–1523.) Indeed, SBA itself acknowledged Appellants were owned by "two individuals," Hyman and Zanziper. (JA1522, JA1565.) The Record thus supports the conclusion that Hyman and Zanziper jointly participated in multiple ventures—not that an overarching partnership entity owned those ventures.

Appellees repeatedly return to the same examples of shared ownership and business activity. (Br. pp.54–60.) Those facts still do not establish the proposition on which Appellees' theory depends: that a partnership-in-fact existed and occupied the ownership position of a common parent. Repetition does not transform evidence of co-investment into evidence of ownership by a partnership.

Because Appellees identify no evidence that a partnership-in-fact owned Appellants or functioned as the common parent contemplated by the Corporate Group Rule, the district court erred in affirming SBA's determination for this

29

additional and independent reason, even if that had been OHA's conclusion, which

(as explained above in Section I) it was not.

## CONCLUSION

The district court's Judgment should be ***reversed***. At a minimum, as Appellees

themselves admit, this matter should be remanded to SBA. The Court should instruct

SBA to reverse all denials of Appellants' requests for PPP-loan forgiveness.

Dated: July 1, 2026.

/s/ Jenny R. Buchheit
Jenny R. Buchheit
ICE MILLER LLP
One American Square, Ste. 2900
Indianapolis, IN 46282
317-236-2100
Jenny.Buchheit@icemiller.com

Joshua Klarfeld
ICE MILLER LLP
600 Superior Ave. East, Ste. 1600
Cleveland, OH 44114
216-394-5063
Joshua.Klarfeld@icemiller.com

/s/ Kirk G. Warner
Kirk G. Warner
J. Mitchell Armbruster
SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, L.L.P.
Post Office Box 2611
Raleigh, NC 27602-2611
919-821-1220
kwarner@smithlaw.com
marmbruster@smithlaw.com
*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B) and 32(f), the brief contains 6,496 words.

2. The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: July 1, 2026.                     /s/ Kirk G. Warner

31

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system.

Service will be accomplished by the appellate CM/ECF system.


     /s/ Kirk G. Warner